**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

TRIVANSKY TYRIQUE SWINGTON,

        Plaintiff,

vs.

THE CITY OF WATERLOO, IOWA,
BLACK HAWK COUNTY JAIL
SHERIFF'S OFFICE, DEPUTY
ANTHONY NAI, DEPUTY JULIE
LEIN, DEPUTY AARON HAAS,
DEPUTY TODD SCHMITT, DEPUTY
B. ROLLINS, DEPUTY WYATT
LANDERS, DEPUTY ZACHARY
HOLBACH and STATE OF IOWA,

        Defendants.

No. C15-0125-LRR

**ORDER**

---

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.   **NON-DISPOSITIVE MOTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . . . . **4**

V.    **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **6**

VI.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

     A.    *Civil Rights Claims under 42 U.S.C. § 1983* . . . . . . . . . . . . . . . . **23**
     B.    *Failure to Properly Respond* . . . . . . . . . . . . . . . . . . . . . . . . . **25**
     C.    *Merits of Plaintiff's Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . **27**
          1.    *Nature of Excessive Force Claim and Deliberate
               Indifference to Medical Needs Claim* . . . . . . . . . . . . . . . . **27**
          2.    *Excessive Force Claim* . . . . . . . . . . . . . . . . . . . . . . . . . **28**
          3.    *Deliberate Indifference to Medical Needs Claim* . . . . . . . . . **35**
          4.    *Other Argument* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**

***VII.   CONCLUSION*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

## *I.  INTRODUCTION*

The matter before the court is the defendants' motion for summary judgment (docket no. 10).   Proceeding pro se, the plaintiff filed an unsigned resistance (docket no. 11). Along with his unsigned resistance, the plaintiff submitted a narrative statement (docket no. 12), a motion to appoint counsel (docket no. 13) and a motion to amend complaint (docket no. 13).   In response to the plaintiff's unsigned resistance, the defendants filed a reply (docket no. 15).   Subsequently, the plaintiff filed a supplement to his unsigned resistance (docket no. 16), which included an affidavit from him (docket no. 16), an amended narrative statement (docket no. 17) and a supplement to his motion to appoint counsel (docket no. 18).   In response to those filings, the defendants filed a second reply (docket no. 19).   Subsequently, the plaintiff filed a motion for discovery (docket no. 20), which the defendants resisted (docket no. 21), and a motion for jury trial (docket no. 22), which the defendants resisted (docket no. 23).   Subsequently, the plaintiff filed a supplement to his motion for a jury trial (docket no. 24), which the defendants seek to strike (docket no. 25), and a clarification of his supplement to his motion for a jury trial (docket no. 26).   Lastly, the plaintiff filed another motion for appointment of counsel (docket no. 28) and submitted correspondence (docket no. 29).   With respect to the correspondence, the defendants responded by reiterating that discovery is unnecessary (docket no. 30).   Neither party requested oral argument, and, in any event, oral argument is not necessary.   The motion for summary judgment and other pending motions are fully submitted.

## *II.  PROCEDURAL HISTORY*

The plaintiff commenced this lawsuit on November 12, 2015.   In his complaint, the plaintiff generally asserts that: (1) Deputy Anthony Nai punched him in the back and ribs; (2) Deputy Aaron Haas struck him in the ribs with his knee; (3) Deputy Julie Lein failed

to stop the assault; (4) another deputy struck him twice in the back of the head and dug his fingers into the soft tissue of his jaw; (5) he refused to let deputies throw him on an unsanitary floor; and (6) he had a seizure but was not taken to the hospital. As directed by the court, the clerk's office filed the plaintiff's complaint (docket no. 3) on February 4, 2016. After the defendants filed an answer (docket no. 7), the court entered a scheduling order (docket no. 8) and denied the plaintiff's request to appoint counsel (docket no. 9). Ultimately, the defendants filed their motion for summary judgment, and the parties submitted filings that are related to the defendants' motion for summary judgment.

### III. NON-DISPOSITIVE MOTIONS

With respect to the plaintiff's motion to appoint counsel (docket nos. 13 & 28) and supplement to his motion to appoint counsel (docket no. 18), the court stands by its previous determination that appointment of counsel is not justified. The record, which includes videos, *see* App'x, CD #1 & CD #2 (docket no. 10), and the plaintiff's assertions that: (1) his legs were grabbed and he hit his head and face on the concrete floor when he fell; (2) he took fist and knee strikes to the left and right side of his rib cage even though his left arm was behind his back; (3) deputies told him to put his right hand behind his back but he could not do so because they were on top of him and pinning him to the ground; (4) he refused to let deputies take him to the ground because the floor is unsanitary; (5) he was placed in a cell that had bodily fluid smeared on the walls, toilet, sink, furniture and cell door window; and (6) even though he complained of headaches and feeling ill, he only saw a nurse after he had a seizure, *see* Supplement (docket no. 18), indicates that the plaintiff's contentions are false and/or frivolous. Accordingly, the plaintiff's motion to appoint counsel (docket nos. 13 & 28) is denied.

Concerning the plaintiff's motion to amend complaint (docket no. 14), the plaintiff merely desires to add additional parties and to seek additional damages. Accordingly, the plaintiff's motion to amend complaint (docket no. 14) is granted. Regarding the plaintiff's

motion for discovery (docket no. 20) and motion for jury trial (docket no. 22), the record clearly establishes that neither discovery nor a jury trial are appropriate. Accordingly, the plaintiff's motion for discovery (docket no. 20) and motion for jury trial (docket no. 22) are denied.

As for the defendants' motion to strike (docket no. 25), the court will consider the plaintiff's filing in light of the plaintiff's clarification of his supplement to his motion for a jury trial (docket no. 26). Accordingly, the defendants' motion to strike (docket no. 25) is denied.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).

"The movant 'bears the initial responsibility of informing the district court of the basis for [his or her] motion,' and must identify 'those portions of [the record] . . . which [he or she] believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson*, 643 F.3d at 1042 (second and third alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also* Fed. R. Civ. P. 56(c)(1)(A) (emphasizing that a motion must be supported by "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"). Once the movant has done so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson*, 643 F.3d at 1042 (quoting *Celotex Corp.*, 477 U.S. at 324).

When doing so, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts' . . . ." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "To survive a motion for summary judgment, the [nonmovant] must substantiate his [or her] allegations with sufficient probative evidence [that] would permit a finding in [his or her] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (third alteration in original) (internal quotation marks omitted) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)). The nonmovant cannot simply rely on unsupported "self-serving allegations and denials . . . to create a genuine issue of material fact." *Anuforo v. Comm'r of Internal Revenue*, 614 F.3d 799, 807 (8th Cir. 2010); *accord Wilson v. Miller*, 821 F.3d 963, 970 (8th Cir. 2016). The nonmovant must substantiate factual allegations with independent documentary evidence. *See Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013). Hence, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Throughout the summary judgment stage, the court must view genuinely disputed "evidence in the light most favorable to the nonmoving party and giv[e] the nonmoving party the benefit of all reasonable inferences." *Crawford v. Van Buren Cty., Ark.*, 678 F.3d 666, 669 (8th Cir. 2012) (citing *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1035 (8th Cir. 2010)); *see also Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (stating that a court views the facts in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts); *Murchison v. Rogers*, 779 F.3d 882, 886-87 (8th Cir. 2015) (viewing evidence in light most favorable to nonmoving party and giving nonmoving party the benefit of all reasonable inferences). Moreover, "the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine

whether there is a genuine issue for trial." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 949 (8th Cir. 2012) (citing *Anderson*, 477 U.S. at 249). No genuine issue for trial exists only if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Ricci*, 557 U.S. at 586 (quoting *Matsushita*, 475 U.S. at 587); *accord Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012); *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009).

## V. RELEVANT FACTUAL BACKGROUND

In November of 2014, the Black Hawk County Jail housed the plaintiff because he had been arrested for and charged with committing robbery in the second degree and violating his parole. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 1; App'x (docket no. 10-3) at 12-15, 22-26. On March 16, 2015, an official from the Black Hawk County Jail recommended that the plaintiff be reclassified from medium classification to maximum classification because the plaintiff had a history of refractory behavior and demonstrated an attitude deficiency. *See* App'x (docket no. 10-3) at 31. Such official noted that the plaintiff was not suitable for general population because he did not adhere to inmate rules and regulations, did not cooperate or respond to jail staff or officers and did not show courtesy or respect to others. *See* App'x (docket no. 10-3) at 31. On May 20, 2015, the plaintiff called his mom to post bond. *See* App'x (docket no. 10-3) at 34.

On July 17, 2015, the plaintiff had a fight with another inmate, Justin Cason. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 5; Affidavit of Mark Herbst (docket no. 10-3) at 6, ¶ 6; App'x (docket no. 10-3) at 36-51. The video of the fight between the plaintiff and Justin Cason indicates that the plaintiff throws his basketball away, turns his attention to Justin Cason, walks to Justin Cason, punches Justin Cason and fights Justin Cason. *See* App'x, CD #1 (docket no. 10). Both inmates were disciplined, but, because he started the fight, the plaintiff received more punishment, including ten days

of administrative segregation and the loss of privileges. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 5; Affidavit of Mark Herbst (docket no. 10-3) at 6, ¶ 6; App'x (docket no. 10-3) at 36-51. The plaintiff did not appeal. *See* App'x (docket no. 10-3) at 36-51.

On August 3, 2015, the plaintiff was using the telephone. *See* Narrative Statement (docket no. 12) at 1; Plaintiff's Affidavit (docket no. 16) at 3. Deputy B. Rollins turned the phone off, and the plaintiff got extremely upset. *See* Narrative Statement (docket no. 12) at 1; Plaintiff's Affidavit (docket no. 16) at 3. Deputy B. Rollins told the plaintiff to return to his cell, and, because the plaintiff did not like how Deputy B. Rollins had treated him and he thought Deputy B. Rollins was looking for a fight, the plaintiff told Deputy B. Rollins that he was not locking down, told him to come make him lock down and called him a "p***y." *See* Narrative Statement (docket no. 12) at 1; Plaintiff's Affidavit (docket no. 16) at 3. The plaintiff refused to return to his cell because he believed that deputies would "f**k him up where nobody [could] see." *See* Plaintiff's Affidavit (docket no. 16) at 3; *see also* Narrative Statement (docket no. 12) at 1.

The plaintiff waited in the A3 Dayroom because he was determined to resolve his issues with Deputy B. Rollins. *See* Plaintiff's Affidavit (docket no. 16) at 3. Deputies entered the A3 Dayroom, and Deputy Julie Lein asked the plaintiff to explain the problem while they headed to the plaintiff's cell. *See* Narrative Statement (docket no. 12) at 1; Plaintiff's Affidavit (docket no. 16) at 3. The plaintiff backed away from Deputy Aaron Haas, and the plaintiff told Deputy Aaron Haas not to touch him after he pointed to the stairs and reached for the plaintiff's arm. *See* Narrative Statement (docket no. 12) at 1.

Deputies repeatedly requested that the plaintiff return to his cell, but the plaintiff refused by verbally threatening deputies and resisting deputies' attempts to escort him back to his cell. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 6; App'x, CD #1 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 6-7, ¶ 7; Affidavit

of Anthony Nai (docket no. 10-4) at 98-99, ¶¶ 2-3; Affidavit of Julie Lein (docket no. 10-4) at 101-02, ¶¶ 2-4; Affidavit of Aaron Haas (docket no. 10-4) at 104-05, ¶¶ 2-3; Affidavit of B. Rollins (docket no. 10-4) at 107-08, ¶¶ 3-8; Affidavit of Wyatt Landers (docket no. 10-4) at 111, ¶ 2; Affidavit of Zachary Holbach (docket no. 10-4) at 113, ¶ 2; Affidavit of Todd Schmitt (docket no. 10-4) at 115-16, ¶¶ 2-3.

The plaintiff noticed that, except for Deputy Julie Lein, deputies displayed aggression, including Deputy Aaron Haas, who pulled out his OC spray. *See* Narrative Statement (docket no. 12) at 1; Plaintiff's Affidavit (docket no. 16) at 3. Because he feared that they were going to harm him, the plaintiff evaded deputies by keeping them in his sight and keeping distance between himself and them. *See* Narrative Statement (docket no. 12) at 1; Supplement to Unsigned Resistance (docket no. 16) at 1; Plaintiff's Affidavit (docket no. 16) at 3. The plaintiff refused to go up the stairs to avoid getting hurt if deputies lashed out at him. *See* Supplement to Unsigned Resistance (docket no. 16) at 1. The plaintiff had a bad feeling that deputies were going to hurt him, and he had heard that deputies assaulted inmates in their cells or placed inmates in cells with their enemies. *See* Plaintiff's Affidavit (docket no. 16) at 3. Deputy Julie Lein and Deputy Aaron Haas asked the plaintiff to go up the stairs and to tell them why he was so upset. *See* Narrative Statement (docket no. 12) at 1. Deputy Julie Lein tried to grab the plaintiff, and the plaintiff pulled away from her. *See* Supplement to Unsigned Resistance (docket no. 16) at 1. Deputy Aaron Haas also tried to grab him, and the plaintiff pulled away from him. *See* Supplement to Unsigned Resistance (docket no. 16) at 1; Plaintiff's Affidavit (docket no. 16) at 3. The plaintiff perceived Deputy Anthony Nai's advancement toward him as threatening and tried to move away. *See* Plaintiff's Affidavit (docket no. 16) at 3. Deputy Anthony Nai grabbed the plaintiff and pushed the plaintiff up the stairs. *See* Supplement to Unsigned Resistance (docket no. 16) at 1; Plaintiff's Affidavit (docket no. 16) at 3. Deputy Aaron Haas put his left arm around the plaintiff's neck, and the plaintiff grabbed the railing of the stairs to prevent himself from falling and moving up the stairs because

he knew he would be assaulted once deputies got him to his cell. *See* Narrative Statement (docket no. 12) at 1; Supplement to Unsigned Resistance (docket no. 16) at 1; Plaintiff's Affidavit (docket no. 16) at 3-4.

Because the plaintiff threatened deputies and physically resisted deputies' attempts to get him to return to his cell, deputies relied on their training to seize different parts of the plaintiff's body and to assist the plaintiff to the floor. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 7; App'x, CD #1 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 7, ¶ 7; App'x (docket no. 10-3) at 52-61; App'x (docket no. 10-4) at 91-117; Affidavit of Anthony Nai (docket no. 10-4) at 99, ¶ 3; Affidavit of Julie Lein (docket no. 10-4) at 102, ¶ 4; Affidavit of Aaron Haas (docket no. 10-4) at 105, ¶ 3; Affidavit of B. Rollins (docket no. 10-4) at 108-09, ¶¶ 5-9; Affidavit of Wyatt Landers (docket no. 10-4) at 111-12, ¶¶ 2-3; Affidavit of Zachary Holbach (docket no. 10-4) at 114, ¶ 3; Affidavit of Todd Schmitt (docket no. 10-4) at 116, ¶ 3. The plaintiff refused to let deputies take him to the unsanitary floor. *See* Plaintiff's Affidavit (docket no. 16) at 4. Even though Deputy Anthony Nai tried to use all of his weight to bring the plaintiff to the ground, the plaintiff resisted. *See* Amended Narrative Statement (docket no. 17) at 1. Deputy Anthony Nai and Deputy Aaron Haas took the plaintiff to the floor. *See* Supplement to Unsigned Resistance (docket no. 16) at 1. All of them landed on the floor. *See* Supplement to Unsigned Resistance (docket no. 16) at 1; Plaintiff's Affidavit (docket no. 16) at 4. Deputy Aaron Haas placed his elbow on the plaintiff's head and lifted himself up while keeping his elbow on the plaintiff's head. *See* Supplement to Unsigned Resistance (docket no. 16) at 2; Plaintiff's Affidavit (docket no. 16) at 4. Deputy Aaron Haas used both of his hands to keep the plaintiff's face on the ground. *See* Supplement to Unsigned Resistance (docket no. 16) at 2; Plaintiff's Affidavit (docket no. 16) at 4. Deputy Wyatt Landers held the plaintiff's legs down. *See* Plaintiff's Affidavit (docket no. 16) at 4.

To prevent assaultive behavior while the plaintiff was being escorted to his cell, deputies attempted to place handcuffs on the plaintiff, but the plaintiff physically resisted his handcuffing by bracing his right arm underneath his chest. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 7; App'x, CD #1 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 7, ¶ 7; Affidavit of Anthony Nai (docket no. 10-4) at 99, ¶ 4; Affidavit of Julie Lein (docket no. 10-4) at 102, ¶ 4; Affidavit of Aaron Haas (docket no. 10-4) at 105, ¶ 4; Affidavit of B. Rollins (docket no. 10-4) at 109, ¶ 9; Affidavit of Wyatt Landers (docket no. 10-4) at 112, ¶ 4; Affidavit of Zachary Holbach (docket no. 10-4) at 114, ¶ 3; Affidavit of Todd Schmitt (docket no. 10-4) at 116, ¶ 4. The plaintiff's left arm was behind his back, and Deputy Anthony Nai commanded the plaintiff to place his right hand behind his back. *See* Narrative Statement (docket no. 12) at 1. In response, the plaintiff yelled: "I can't you f**king b**ch yall pinning me to the f**king ground get his fat a** the f**k off me." *See* Narrative Statement (docket no. 12) at 1.

Despite repeated directives to place his right hand behind his back, the plaintiff refused to do so. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 7; App'x, CD #1 (docket no. 10); Affidavit of Anthony Nai (docket no. 10-4) at 99, ¶ 4; Affidavit of Aaron Haas (docket no. 10-4) at 105, ¶ 4; Affidavit of B. Rollins (docket no. 10-4) at 109, ¶ 9; Affidavit of Wyatt Landers (docket no. 10-4) at 112, ¶ 4; Affidavit of Zachary Holbach (docket no. 10-4) at 114, ¶ 3; Affidavit of Todd Schmitt (docket no. 10-4) at 116, ¶ 4. Deputies relied on their training and used force, including pressure to the jaw, knee strikes to the plaintiff's side and fist strikes to the plaintiff's lower back, to gain control of the plaintiff's right hand. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 7; App'x, CD #1 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 7, ¶ 7; Affidavit of Anthony Nai (docket no. 10-4) at 99, ¶ 4; Affidavit of Julie Lein (docket no. 10-4) at 102, ¶ 4; Affidavit of Aaron Haas (docket no. 10-4) at 105, ¶ 4; Affidavit of B. Rollins (docket no. 10-4) at 109, ¶ 9; Affidavit of Wyatt Landers (docket

no. 10-4) at 112, ¶ 4; Affidavit of Zachary Holbach (docket no. 10-4) at 114, ¶ 3; Affidavit of Todd Schmitt (docket no. 10-4) at 116, ¶ 4; Unsigned Resistance (docket no. 11) at 1; Narrative Statement (docket no. 12) at 1; Plaintiff's Affidavit (docket no. 16) at 4. After the plaintiff responded to deputies' use of force by placing his right hand behind his back, deputies used no additional force and secured the plaintiff's right hand. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 7; App'x, CD #1 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 7, ¶ 7; Affidavit of Anthony Nai (docket no. 10-4) at 99, ¶ 4; Affidavit of Julie Lein (docket no. 10-4) at 102, ¶ 4; Affidavit of Aaron Haas (docket no. 10-4) at 105, ¶ 4; Affidavit of B. Rollins (docket no. 10-4) at 109, ¶ 9; Affidavit of Wyatt Landers (docket no. 10-4) at 112, ¶ 4; Affidavit of Zachary Holbach (docket no. 10-4) at 114, ¶ 3; Affidavit of Todd Schmitt (docket no. 10-4) at 116, ¶ 4; Narrative Statement (docket no. 12) at 1.

Deputies assisted the plaintiff to his feet, escorted the plaintiff to a cell in the SHU, placed the plaintiff on a bunk, removed the plaintiff's handcuffs and exited the plaintiff's cell. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶¶ 7-8; App'x, CD #1 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 7, ¶ 7; Affidavit of Anthony Nai (docket no. 10-4) at 99, ¶ 5; Affidavit of Julie Lein (docket no. 10-4) at 102, ¶ 5; Affidavit of Aaron Haas (docket no. 10-4) at 105, ¶ 4; Affidavit of B. Rollins (docket no. 10-4) at 109, ¶ 10; Affidavit of Wyatt Landers (docket no. 10-4) at 112, ¶ 5; Affidavit of Zachary Holbach (docket no. 10-4) at 114, ¶ 4; Affidavit of Todd Schmitt (docket no. 10-4) at 116, ¶ 5. While he was being transported to his cell and after deputies left his cell, the plaintiff threatened and cursed deputies. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶¶ 7-8; App'x, CD #1 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 7, ¶ 7; Affidavit of Anthony Nai (docket no. 10-4) at 99, ¶ 5; Affidavit of Julie Lein (docket no. 10-4) at 102, ¶ 5; Affidavit of Aaron Haas (docket no. 10-4) at 105, ¶ 4; Affidavit of B. Rollins (docket no. 10-4) at 109, ¶ 10; Affidavit of Wyatt Landers (docket no. 10-4) at 112, ¶ 5; Affidavit of Zachary Holbach (docket no.

10-4) at 114, ¶ 4; Affidavit of Todd Schmitt (docket no. 10-4) at 116, ¶ 5; Narrative Statement (docket no. 12) at 2; Plaintiff's Affidavit (docket no. 16) at 4.

As soon as deputies left, the plaintiff got up and kicked the door, and, shortly after kicking the door, the plaintiff punched a mirror with his right hand. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶¶ 8-9; App'x, CD #2 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 8, ¶ 8; Affidavit of Julie Lein (docket no. 10-4) at 102, ¶ 5; Affidavit of B. Rollins (docket no. 10-4) at 109, ¶ 10; Affidavit of Todd Schmitt (docket no. 10-4) at 116, ¶ 5; Plaintiff's Affidavit (docket no. 16) at 4.

At approximately a quarter past midnight, a nurse examined the plaintiff because he complained that he injured his right hand. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 11; App'x, CD #2 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 8, ¶ 8; App'x (docket no. 10-4) at 64-66. The nurse found a small bruise. *See* App'x (docket no. 10-4) at 64-66. Around five after 1:00 a.m., the plaintiff utilized the intercom button, fell backwards approximately two minutes later and, while laying on the ground, started shaking. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 10; App'x, CD #2 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 8, ¶ 8; Narrative Statement (docket no. 12) at 2; Plaintiff's Affidavit (docket no. 16) at 4. Deputies and a nurse examined the plaintiff. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 10; App'x, CD #2 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 8-9, ¶ 8; App'x (docket no. 10-4) at 64-66; Plaintiff's Affidavit (docket no. 16) at 4. Because the plaintiff thought he might have fallen and hit his head, the nurse examined the plaintiff, but she did not discover any redness, swelling or any indication that the plaintiff hit his head. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 11; App'x (docket no. 10-4) at 64-66. In response to a comment by a deputy, the plaintiff indicated that he did not care about going to the hospital. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 10; Affidavit of Mark

Herbst (docket no. 10-3) at 9, ¶ 9; App'x (docket no. 10-4) at 66; Narrative Statement (docket no. 12) at 2. Around ten after 2:00 a.m., deputies entered the SHU cell with medication, and the plaintiff took it. *See* App'x, CD #2 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 9, ¶ 8; App'x (docket no. 10-4) at 64-66. A nurse rechecked the plaintiff's right hand at 2:14 p.m. *See* App'x, CD #2 (docket no. 10); Affidavit of Mark Herbst (docket no. 10-3) at 8, ¶ 8.

The video of the A3 Dayroom on August 3, 2015 indicates the following:

> The plaintiff is to the right of the Dayroom tables and is in and out of the view of the camera. *See* App'x, CD #1 (docket no. 10) at 9:21:06 to 9:25:31. Except for the plaintiff, inmates return to their cells. *Id.* at 9:21:06-42. The plaintiff remains outside of his cell for nearly four minutes longer than the other inmates. *Id.* at 9:21:42 to 9:25:36. The plaintiff aggressively moves toward the control room window. *Id.* at 9:25:31-36. Deputy Julie Lein and Deputy Aaron Haas enter the Dayroom from the control room. *Id.* at 9:25:36-38. Deputy Aaron Haas points upstairs. *Id.* at 9:25:38-39. Deputy Todd Schmitt enters the room, pulled out his OC spray, and then put it back in his pocket. *Id.* at 9:25:40-47. While facing Deputy Aaron Haas, the plaintiff backs away from Deputy Aaron Haas. *Id.* at 9:25:38-42. Deputy Julie Lein signals for the plaintiff to go upstairs. *Id.* at 9:25:42. Deputy Aaron Haas pulled out his OC spray and pointed it at the plaintiff. *Id.* at 9:25:42-56. The plaintiff moved away from Deputy Aaron Haas. *Id.* at 9:25:48-56. While pointing his OC spray at the plaintiff, Deputy Aaron Haas points upstairs. *Id.* at 9:25:57. The plaintiff moved away from Deputy Aaron Haas and Deputy Todd Schmitt and toward Deputy Julie Lein and the staircase. *Id.* at 9:25:58 to 9:26:04. Deputy Anthony Nai enters the room. *Id.* at 9:26:02-04. Deputy Wyatt Landers enters the room. *Id.* at 9:26:04. Deputy Julie Lein signals for the plaintiff to go upstairs and keeps her arm outstretched. *Id.* at 9:26:04-13. With their arms at their sides or directing the plaintiff, all five deputies stand in positions in an attempt to get the plaintiff to go upstairs. *Id.* at 9:26:07-12. Deputy Aaron

Haas put his OC spray back in his pocket. *Id*. at 9:26:07-11. Rather than go upstairs, the plaintiff moved past Deputy Julie Lein and past the staircase. *Id*. at 9:26:10-14. With her arm still extended, Deputy Julie Lein put her hand on the crook of the plaintiff's left arm. *Id*. at 9:26:13. The plaintiff moved out of her grasp. *Id*. at 9:26:14. Deputy Aaron Haas put his hand on the plaintiff's upper left arm. *Id*. at 9:26:14. To get Deputy Aaron Haas' hand off of his arm, the plaintiff aggressively raised his left arm up over his head. *Id*. at 9:26:15. The plaintiff moved forward, and, while facing the plaintiff's back, Deputy Anthony Nai put both of his arms around the plaintiff. *Id*. at 9:26:16-19. The plaintiff, Deputy Anthony Nai and Deputy Aaron Haas moved to the base of the stairs and then up several stairs. *Id*. at 9:26:16-23. While face to face with the plaintiff, Deputy Aaron Haas put his left arm around the plaintiff's neck. *Id*. at 9:26:17-19. When on the lower part of the staircase, the plaintiff held the railing on the left side of the staircase with his left hand. *Id*. at 9:26:19-21. Deputy Anthony Nai tried to place the plaintiff's left arm behind the plaintiff's back. *Id*. at 9:26:22. The plaintiff held the railing on the right side of the staircase with his right hand. *Id*. at 9:26:23-26. When the plaintiff, Deputy Anthony Nai and Deputy Aaron Haas were on the staircase, Deputy Todd Schmitt and Deputy Wyatt Landers moved to the base of the stairs. *Id*. at 9:26:20-26. The plaintiff, Deputy Anthony Nai and Deputy Aaron Haas turned around to the left and moved down the staircase. *Id*. at 9:26:25-27. Deputy Anthony Nai held onto the plaintiff's left arm. *Id*. at 9:26:19-38. Deputy Aaron Haas held onto the plaintiff's neck. *Id*. at 9:26:19-37. The plaintiff, Deputy Anthony Nai, Deputy Aaron Haas, Deputy Todd Schmitt and Deputy Wyatt Landers moved from the base of the staircase toward a cell and then toward the wall across from the staircase. *Id*. at 9:26:27-32. The plaintiff faced the wall. *Id*. at 9:26:31-33. Deputy Wyatt Landers knelt and held onto the plaintiff's feet. *Id*. at 9:26:32-37. Deputy Aaron Haas stood on the plaintiff's right and Deputy Anthony Nai stood on the plaintiff's left. *Id*. at 9:26:31-34. While bending over, Deputy Anthony Nai, Deputy Aaron Haas and Deputy Wyatt Landers took the plaintiff to the ground. *Id*.

at 9:26:34-37. When doing so, Deputy Aaron Haas' left hip landed on the floor along the plaintiff's right side, and Deputy Anthony Nai landed on his knees along the plaintiff's left side. *Id*. at 9:26:37. The left side of the plaintiff's upper body landed on the floor. *Id*. at 9:26:37-38. Deputy Aaron Haas released his left arm from around the plaintiff's neck, kept the lower part of his body near the plaintiff and kept his upper body angled over the plaintiff's right shoulder and head. *Id*. Deputy Aaron Haas placed his left forearm on the plaintiff's head. *Id*. at 9:26:38-39. The plaintiff had his left hand behind him, his left chest on the floor and his right arm in front of his stomach. *Id*. at 9:26:37-39. Deputy Wyatt Landers held onto the plaintiff's right leg. *Id*. at 9:26:37. The plaintiff moved his right leg towards Deputy Aaron Haas and shifted toward Deputy Aaron Haas. *Id*. at 9:26:37-39. Deputy Aaron Haas positions the left side of his upper body over the right side of the plaintiff's upper body. *Id*. at 9:26:37-39. While on his knees, Deputy Aaron Haas places both of his hands on the plaintiff's head so that the left side of the plaintiff's face and left shoulder remain on the ground. *Id*. at 9:26:40-50. Deputy Anthony Nai is on his knees on the other side of the plaintiff. *Id*. at 9:26:40-42. Deputy Anthony Nai maintains control of the plaintiff's left arm. *Id*. at 9:26:41-44. Deputy Julie Lein approaches the plaintiff, Deputy Anthony Nai, Deputy Aaron Haas and Deputy Wyatt Landers. *Id*. at 9:26:43-53. Deputy Julie Lein leans in toward the plaintiff and other deputies, tries to secure the plaintiff's right arm and moves slightly away from the plaintiff. *Id*. at 9:26:44-46. Deputy Aaron Haas, Deputy Wyatt Landers and Deputy Anthony Nai are on their knees. *Id*. at 9:26:41-50. Deputy Zachary Holbach enters the room. *Id*. at 9:26:45. Deputy Wyatt Landers maintains control of the plaintiff's legs. *Id*. at 9:26:37 to 9:27:20. While Deputy Julie Lein is leaning in toward the plaintiff, Deputy Anthony Nai raises his closed hand and lowers it towards the plaintiff's lower back five times. *Id*. at 9:26:47-53. Deputy Aaron Haas releases the plaintiff's head and shifts to secure the plaintiff's right hand. *Id*. at 9:26:50. Deputy Zachary Holbach reaches in towards the plaintiff's head with his left hand, moves to the plaintiff's

15

right side, leans over the plaintiff so that his head is close to the plaintiff's head and maintains control of the plaintiff's head. *Id*. at 9:26:50-54. Deputy Zachary Holbach remains on the plaintiff's right side, hunched over the plaintiff and close to the plaintiff's head. *Id*. at 9:26:50-58. Deputy Aaron Haas brings his knee up to the plaintiff's lower body twice. *Id*. at 9:26:51-53. Deputy Zachary Holbach, Deputy Aaron Haas, Deputy Wyatt Landers, Deputy Anthony Nai and Deputy Todd Schmitt are on their knees hunched over the plaintiff, who does not move. *Id*. at 9:26:53 to 9:27:18. Deputy Julie Lein is between Deputy Aaron Haas and Deputy Wyatt Landers and is standing up and hunched over the plaintiff. *Id*. at 9:26:53 to 9:27:07. Deputy Aaron Haas, Deputy Julie Lein and Deputy Anthony Nai are working near the plaintiff's lower back. *Id*. at 9:26:54 to 9:27:06. Deputy Julie Lein stands up and walks away. *Id*. at 9:27:06-12. Deputy Zachary Holbach, Deputy Aaron Haas, Deputy Wyatt Landers, Deputy Anthony Nai and Deputy Todd Schmitt stand up. *Id*. at 9:27:17-22. All of them assist the plaintiff to his feet. *Id*. at 9:27:21-23. Deputy Aaron Haas and Deputy Anthony Nai guide the plaintiff to a SHU cell. *Id*. at 9:27:23-25. Deputy Aaron Haas releases the plaintiff. *Id*. at 9:27:26-27. Deputy Anthony Nai continues to guide the plaintiff to a SHU cell. *Id*. at 9:27:27.

The video of the A2 Dayroom on August 3, 2015 indicates the following:

The plaintiff, Deputy Anthony Nai and other deputies enter the room. *See* App'x, CD #1 (docket no. 10) at 9:27:30-32. Deputy Anthony Nai, Deputy Aaron Haas and other deputies guide the plaintiff into a SHU cell. *Id*. at 9:27:35-38. Seven deputies enter the SHU cell with the plaintiff. *Id*. at 9:27:36-47. Those deputies stay in the SHU cell with the plaintiff with the door open. *Id*. at 9:27:47 to 9:30:35. Some deputies start to leave the SHU cell. *Id*. at 9:29:10-17. Some deputies return to the SHU cell. *Id*. at 9:29:17-59. Deputies leave the SHU cell. *Id*. at 9:30:26-34.

The video of the SHU cell on August 3, 2015 indicates the following:

The plaintiff, Deputy Anthony Nai, Deputy Aaron Haas and other deputies enter the SHU cell. *See* App'x, CD #1 (docket no. 10) at 9:27:35-39. The plaintiff faces the wall and places his knees on the bunk. *Id*. at 9:27:41-46. Deputy Aaron Haas and Deputy Anthony Nai assist the plaintiff so that he is laying face down on his bunk. *Id*. at 9:27:46-49. The plaintiff remains face down with his handcuffs on. *Id*. at 9:27:47-9:30:0. Some deputies start to leave the SHU cell. *Id*. at 9:29:09-19. Some deputies return to the SHU cell. *Id*. at 9:29:23 to 9:30:00. Deputy Anthony Nai removes the plaintiff's handcuffs. *Id*. at 9:30:01-24. Deputies leave the SHU cell. *Id*. at 9:30:27-33. The plaintiff pushes himself up with his left hand and right hand and gets to his feet. *Id*. at 9:30:33-37. The plaintiff walks to the door and looks out of the window. *Id*. at 9:30:35-43. The plaintiff backs away from the door and kicks the door eleven times with his right foot. *Id*. at 9:30:46 to 9:31:11. The plaintiff punches the mirror with his right hand. *Id*. at 9:31:15-18. The plaintiff raises and looks at his right hand. *Id*. at 9:31:58 to 9:32:00.

Additional video of the SHU cell indicates the following:

The plaintiff paced in his SHU cell. *See* generally App'x, CD #2 (docket no. 10) at 9:31:57 to 10:06:49. The plaintiff periodically speaks through the intercom. *Id*. at 9:34:44 to 2:10:18-25. The plaintiff raises his right fist, looks at it and picks at it. *See id*. at 9:36:17-21. The plaintiff obtains toilet paper, wets the toilet paper and throws it at the camera with his right hand. *Id*. at 9:36:45 to 9:37:20. The plaintiff raises his right hand and twists his hair. *Id*. at 9:38:01-05. The plaintiff speaks to someone outside the SHU cell. *Id*. at 9:38:59 to 9:41:42. The plaintiff raises his left hand and then his right hand and adjusts his hair. *Id*. at 9:43:53 to 9:45:03. The plaintiff raises his right hand and adjusts his hair. *Id*. at 9:45:48 to 9:46:06. The plaintiff places his right hand on the door. *Id*. at 9:48:17-38. The plaintiff raises his hands and adjusts his hair. *Id*. at 9:49:09-35. The plaintiff scratches his left hand with his right hand. *Id*. at 9:49:51-58. The plaintiff raises his right arm above his head, rests it on the door and

adjusts his hair with his right hand. *Id*. at 9:51:22 to 9:52:17. The plaintiff throws more toilet paper at the camera with his right hand. *Id*. at 9:55:17-45. The plaintiff puts his right hand on the wall and kicks the door. *Id*. at 9:56:01-11. The plaintiff speaks to someone outside the SHU cell. *Id*. at 9:57:22 to 10:02:35. The plaintiff sits down and looks at his hand. *Id*. at 10:06:49 to 10:08:15. The plaintiff stands up. *Id*. at 10:08:15 to 10:09:24. The plaintiff sits down until he clears the camera of toilet paper by jumping up and swiping the lens with his right hand. *Id*. at 10:09:24 to 10:16:32. The plaintiff bends over and picks up the toilet paper with both hands. *Id*. at 10:16:32-36. The plaintiff throws the toilet paper into the toilet with his right hand. *Id*. at 10:16:36-37. The plaintiff sits down. *Id*. at 10:17:20 to 10:18:40. The plaintiff gets up, stands by the door and rests his face on his right hand. *Id*. at 10:18:40 to 10:21:14. The plaintiff passes his toilet paper through the door, kicks some toilet paper under the door, stands against or near the door, periodically talks to someone outside his SHU cell, hits the door with his right hand, scratches the top of his head with his right hand, leans against the door with his right arm, periodically places his right hand on the door and frequently adjusts his hair with his right hand and both hands. *Id*. at 10:21:14 to 12:11:00. The plaintiff sits down on his bunk. *Id*. at 12:11:01-08. A deputy and a nurse enter the SHU cell. *Id*. at 12:11:08-11. A deputy provides the plaintiff with bedding. *Id*. at 12:11:08-14. The nurse examines the plaintiff's right hand, compares it to his left hand, talks to the plaintiff, assesses the plaintiff, provides the plaintiff with an ice pack and leaves the SHU cell. *Id*. at 12:11:13 to 12:14:03. The plaintiff puts the ice pack on his right hand. *Id*. at 12:13:09. The plaintiff puts the ice pack on a shelf. *Id*. at 12:19:12. The plaintiff makes his bed with both of his hands. *Id*. at 12:19:15 to 12:29:54. The plaintiff gets into his bed. *Id*. at 12:29:54 to 12:30:16. The plaintiff gets out of his bed, walks to the door, bends down and stands near the door. *Id*. at 1:05:31 to 1:06:16. The plaintiff looks out of the window. *Id*. at 1:06:16 to 1:07:02. The plaintiff falls backward to the ground. *Id*. at 1:07:02-04. The plaintiff's butt, then upper left side, including his left arm, land on the

floor. *Id*. at 1:07:04. The plaintiff's shoulders land on the floor and then the plaintiff's head lands on the floor. *Id*. at 1:07:04-05. The plaintiff's head remains in the same position, and the plaintiff's arms and legs shake. *Id*. at 1:07:05-20. The plaintiff stays on his back, moves very little and brings his arms and hands over his stomach. *Id*. at 1:07:20 to 1:08:43. Deputies enter the SHU cell and check the plaintiff. *Id*. at 1:08:43 to 1:23:17. A nurse enters the SHU cell and examines the plaintiff. *Id*. at 1:09:22 to 1:12:49. The plaintiff moves. *Id*. at 1:10:29-34. Deputies assist the plaintiff to his feet. *Id*. at 1:11:15-25. Deputies move the plaintiff to his bunk. *Id*. at 1:11:26-28. The plaintiff sits on his bunk unassisted. *Id*. at 1:11:28 to 1:23:17. The nurse leaves the SHU cell. *Id*. at 1:12:49. The nurse returns to the SHU cell with equipment. *Id*. at 1:16:46-55. The nurse evaluates the plaintiff, including taking his vitals and checking the back of his head. *Id*. at 1:16:55 to 1:23:09. The nurse leaves the SHU cell. *Id*. at 1:23:09. Deputies leave the SHU cell. *Id*. at 1:23:17. The plaintiff gets up. *Id*. at 1:23:14-28. The plaintiff places his bedding on the ground. *Id*. at 1:23:28-38. The plaintiff gets into his bed. *Id*. at 1:23:38-50. The plaintiff gets out of his bed, pushes the intercom, stands by the door and then gets back into his bed. *Id*. at 2:03:30 to 2:04:52. Deputies enter the SHU cell with medication. *Id*. at 2:09:53 to 2:10:12. The plaintiff takes the medication. *Id*. at 2:10:10-18. Deputies leave the SHU cell. *Id*. at 2:10:19-22. The plaintiff lays back down in his bed. *Id*. at 2:10:18-25. The plaintiff gets up, moves his bedding back to his bunk and lays down. *Id*. at 2:53:27 to 2:54:21. The plaintiff gets up walks over to the intercom, stands by the door and returns to his bed. *Id*. at 8:01:27 to 8:06:06. The plaintiff leaves the SHU cell. *Id*. at 12:37:54. The plaintiff returns to the SHU cell. *Id*. at 1:36:21. A deputy and a nurse enter the SHU cell. *Id*. at 2:13:54-2:14:02. A deputy and the nurse leave the SHU cell. *Id*. at 2:14:55-2:15:07. The plaintiff stretches, removes his shirt and examines himself. *Id*. at 2:19:43 to 2:27:54. The plaintiff retrieves food and eats, in part by using his right hand. *Id*. at 5:29:49 to 5:38:13. The plaintiff gets medication and takes it. *Id*. at 7:53:37 to 7:54:13. The plaintiff throws

water and toilet paper at the camera. *Id*. at 9:06:12 to
9:46:25. The plaintiff removes the toilet paper from the
camera. *Id*. at 9:46:27. The plaintiff uses his right hand to
put his socks on his feet. *Id*. at 9:48:00-35. The plaintiff lays
down in his bed. *Id*. at 10:04:54. For the most part, the
plaintiff remains in his bed. *Id*. at 10:04:54 to 9:10:33.

After the plaintiff refused to lock down on August 3, 2015, the Black Hawk County Sheriff's Office completed an incident report and a log regarding the type of force used and the justification for the use of force, and deputies that were involved in the incident completed narrative reports. *See* App'x (docket no. 10-3) at 52-61. Additionally, shift notes indicate that, on August 3, 2015, the plaintiff refused to lock down, roving deputies were called and the plaintiff was placed in the SHU. *See* App'x (docket no. 10-3) at 62. The August 4, 2015 shift notes indicate that: the plaintiff used the intercom to explain that he felt weird, the plaintiff laid on the floor after indicating he felt weird, a nurse and deputies responded, the plaintiff would not immediately respond to questions, the plaintiff's vitals and blood sugar were checked and determined to be fine, the plaintiff spoke clearly before the nurse and deputies left the plaintiff's cell, deputies had the plaintiff place his mattress on the floor to prevent a possible fall and a review of the video indicated that the plaintiff did fall to the ground but did not appear to hit his head. *See* App'x (docket no. 10-3) at 62. They also indicate that the plaintiff threw water around his cell because he was dissatisfied that his requests were not being met, the plaintiff was told that he would be evaluated and medical did evaluate his injuries. *See* App'x (docket no. 10-3) at 62.

After August 4, 2015, the plaintiff never reported any serious medical need, and nurses routinely checked the plaintiff while he remained in administrative segregation. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 11; App'x (docket no. 10-4) at 25-66. The plaintiff completed multiple inmate request forms and/or a grievance in which he asserted that he had been assaulted, landed on his right hand after his legs were

snatched out from under him, was punched and kneed in the ribs, and experienced a seizure after "taking blows to the back of the head." *See* App'x (docket no. 10-3) at 63-64, 67-69. His last grievance, which is dated September 9, 2015, states: "My legs were snatched out from under me and I landed on my right arm injuring my hand. I suffered multiple blows to my head, back and right rib cage [even though I did not show any signs that] I would become violent. I refused to let them throw me on the filthy floor [but that gave deputies no right] to strike me. I was moved to A2 where I had a seizure . . . a little after 11 p.m." *See* App'x (docket no. 10-3) at 70.

On September 11, 2015, the plaintiff pled guilty to conspiracy to commit robbery, and the Iowa District Court for Black Hawk County sentenced the plaintiff to an indeterminate term of confinement of not more than 10 years. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 2; App'x (docket no. 10-3) at 71-74. On September 15, 2015, the Black Hawk County Jail transferred the plaintiff to the Iowa Medical and Classification Center. *See* Statement of Undisputed Material Facts (docket no. 10-2) at ¶ 3; App'x (docket no. 10-3) at 14, 21, 76.

The plaintiff's inmate activity log indicates the following:

> On May 23, 2015, the plaintiff received a warning about being late for lockup. *See* App'x (docket no. 10-3) at 17. On June 9, 2015, the plaintiff lost the privilege of using the library phone. *See* App'x (docket no. 10-3) at 17. On June 11, 2015, the plaintiff became agitated that he could not use the library phone. *See* App'x (docket no. 10-3) at 17. On July 8, 2015, the plaintiff went to the library and used the library phone. *See* App'x (docket no. 10-3) at 18. On July 17, 2015, the plaintiff and Justin Cason fought each other, and the plaintiff moved to A-Pod. *See* App'x (docket no. 10-3) at 18. On July 18, 2015, the plaintiff received a citation for fighting and a notice of his rights. *See* App'x (docket no. 10-3) at 18. On July 27, 2015, the plaintiff got out of administrative segregation. *See* App'x (docket no. 10-3) at 18. On August

1, 2015, the plaintiff could not use the programs phone because he abused the privilege on multiple occasions while he was in D-Pod.  *See* App'x (docket no. 10-3) at 19.

On August 3, 2015, the plaintiff threw wet toilet paper on the camera lens in his cell, kicked his cell door, uncovered his camera and gave his toilet paper to a deputy.  *See* App'x (docket no. 10-3) at 19.  On August 4, 2015, a nurse saw the plaintiff pursuant to his complaint about his right hand.  *See* App'x (docket no. 10-3) at 19.  The nurse gave the plaintiff an ice pack, and a deputy gave the plaintiff bedding.  *See* App'x (docket no. 10-3) at 19.  On August 4, 2015, the plaintiff complained that he felt weird but would not elaborate on his symptoms.  *See* App'x (docket no. 10-3) at 19.  The plaintiff laid down on the floor.  *See* App'x (docket no. 10-3) at 19.  A nurse determined that the plaintiff's vitals were fine.  *See* App'x (docket no. 10-3) at 19.  The plaintiff's mattress was placed on the floor for the night.  *See* App'x (docket no. 10-3) at 19.  On August 4, 2015, the plaintiff complained that he had head pain and requested Tylenol.  *See* App'x (docket no. 10-3) at 19.  A nurse gave the plaintiff two Tylenol.  *See* App'x (docket no. 10-3) at 19.  The plaintiff refused breakfast and lunch but ate dinner.  *See* App'x (docket no. 10-3) at 19.  On August 4, 2015, the plaintiff's water was shut off because he was throwing it around his cell.  *See* App'x (docket no. 10-3) at 19.  The plaintiff threatened to get a deputy on the outside.  *See* App'x (docket no. 10-3) at 19.  The plaintiff complained about not being seen by medical after the incident that occurred on the evening of August 3, 2015.  *See* App'x (docket no. 10-3) at 19.  On August 5, 2015, the plaintiff complained about the dirtiness of his cell, asked to be evaluated by medical because of the incident that occurred on the evening of August 3, 2015 and complained that he had various pains.  *See* App'x (docket no. 10-3) at 19-20.  On August 6, 2016, the plaintiff refused breakfast and lunch, the plaintiff complained that he had sharp pains in his head and medical indicated that they had spoken to the plaintiff multiple times.  *See* App'x (docket no. 10-3) at 20.  On August 17, 2015, the plaintiff got out of administrative segregation.  *See* App'x (docket no. 10-3) at 20.  On August 24, 2015, the

plaintiff refused his medication. *See* App'x (docket no. 10-3) at 20. On September 8, 2015, the plaintiff's classification changed to general population. *See* App'x (docket no. 10-3) at 20. On September 15, 2015, the plaintiff was transferred to another facility. *See* App'x (docket no. 10-3) at 20.

## VI. ANALYSIS

The plaintiff contends that the defendants' actions amounted to a civil rights violation under 42 U.S.C. § 1983. Specifically, the plaintiff alleges a violation of his right to be free from the use of excessive force and a violation of his right to be free from the deliberate indifference to his medical needs.

### A. Civil Rights Claims under 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Such statute was designed to provide "a broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). However, 42 U.S.C. § 1983 provides no substantive rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). "[O]ne cannot go into court and claim a 'violation of [42 U.S.C.] § 1983'—for [42 U.S.C.] § 1983 by itself does not protect anyone against anything." *Chapman*, 441 U.S. at 617. Rather, 42 U.S.C. § 1983 provides a remedy for violations of the "rights, privileges, or immunities

secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271 (stating that 42 U.S.C. § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred'"); *Graham*, 490 U.S. at 393-94 (same); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (noting that the phrase "Constitution and laws" means that 42 U.S.C. § 1983 provides remedies for violations of rights created by federal statutes, as well as those created by the Constitution). Thus, "[t]o state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution [or] laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Van Zee v. Hanson*, 630 F.3d 1126, 1128 (8th Cir. 2011) ("To state a claim under § 1983, a plaintiff must allege (1) that the defendant acted under color of state law, and (2) that the alleged conduct deprived the plaintiff of a constitutionally protected federal right.").

In response to a claim under 42 U.S.C. § 1983, a defendant may assert the defense of qualified immunity. The Eighth Circuit has explained that:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense.

*Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (citations omitted). "The defense of qualified immunity gives government officials engaged in discretionary activities

immunity from liability unless their conduct violates 'clearly established statutory or constitutional rights.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Officials are entitled to qualified immunity only to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hedges v. Poletis*, 177 F.3d 1071, 1074 (8th Cir. 1999) (quoting *Harlow*, 457 U.S. at 818). "Qualified immunity is available 'to all but the plainly incompetent or those who knowingly violate the law.'" *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (quoting *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004)) (internal quotation marks omitted). When analyzing qualified immunity, the Eighth Circuit has instructed district courts to conduct a two-part inquiry:

> The court must first consider the threshold inquiry of whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the defendant['s] conduct violated a constitutional right. If a constitutional right has not been violated, it is unnecessary to inquire further regarding qualified immunity. If a violation could be established on the facts alleged, the second inquiry is whether the right was clearly established at the time the violation occurred.

*Id.* (citations omitted); *accord Smith v. City of Minneapolis*, 754 F.3d 541, 545-46 (8th Cir. 2014).

### B. Failure to Properly Respond

The plaintiff filed an unsigned resistance. But, the plaintiff's resistance is not proper because he did not respond to the defendants' statement of material facts, provide an additional statement of material facts, provide relevant legal authority to support his assertions or authenticate materials in the record. Indeed, the plaintiff did not expressly admit, deny or qualify each of the facts set forth in the statement of undisputed material

facts that the defendants attached to their motion for summary judgment. *See* LR 56.b.2. The plaintiff's failure to file a proper response to the defendants' statement of undisputed material facts constitutes an admission of each of these facts. *See* LR 56.b.; *accord* Fed. R. Civ. P. 56(e)(2)-(4) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion, . . . grant summary judgment if the motion and supporting materials—including facts considered undisputed—show that the movant is entitled to it . . . or . . . issue any other appropriate order").

Because the plaintiff did not file a proper resistance and did not request additional time to respond, it is appropriate to consider the merits of the defendants' motion for summary judgment without waiting any longer for the plaintiff to furnish evidence, citations or other reasons for denying it. *See Interstate Power Co. v. Kansas City Power & Light Co.*, 992 F.2d 804, 807 (8th Cir. 1993) ("Even if a motion for summary judgment . . . stands unopposed, the . . . court must still determine that the moving party is entitled to judgment as a matter of law . . . ."); *cf. Johnson v. Boyd-Richardson Co.*, 650 F.2d 147, 149 (8th Cir. 1981) (requiring court to "inquire into the merits of [a motion to dismiss] and to grant or deny it, as the case may be, in accordance with the law and the relevant facts"). In light of the plaintiff's admission of the facts included in the defendants' statement of undisputed material facts, the court concludes that the defendants are entitled to summary judgment. It is appropriate to grant summary judgment in favor of the defendants for the reasons stated in their brief. The defendants adequately set forth the law and apply such law to the undisputed material facts. Given the plaintiff's nearly complete failure to come forward with any evidence or relevant legal authority, the defendants are entitled to judgment as a matter of law with respect to the plaintiff's excessive force claim and deliberate indifference to medical needs claim. The record, even when viewed in the light most favorable to the plaintiff, fails to establish a genuine issue

of material fact with regard to whether the defendants violated the plaintiff's constitutional rights and whether the defendants are entitled to qualified immunity.

### C. Merits of Plaintiff's Claims[1]

#### 1. Nature of Excessive Force Claim and Deliberate Indifference to Medical Needs Claim

The plaintiff never asserted that he is suing any deputy in his or her individual capacity. Consequently, the plaintiff is only suing deputies in their official capacity. *See Alexander v. Hedback*, 718 F.3d 762, 766 n.4 (8th Cir. 2013) (noting that it is assumed that a plaintiff is suing a defendant only in his or her official capacity if a plaintiff does not expressly and unambiguously state that a defendant is being sued in his or her individual capacity). The plaintiff, however, does not establish that any conduct occurred pursuant to an unconstitutional policy or as a result of a failure to properly supervise or train an employee. Hence, the plaintiff's action is subject to dismissal. *See id.* at 766-67 (determining that plaintiff failed to set forth sufficient facts to show a direct causal link between a municipal policy or custom and the alleged constitutional deprivation); *Elder-Keep v. Aksamit*, 460 F.3d 979, 986-87 (8th Cir. 2006) (same).

Relatedly, "[t]o establish municipal liability under [42 U.S.C.] § 1983, a plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817-18 (8th Cir. 2009) (citing *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690-92 (1978)). The plaintiff's claim against the City of Waterloo and the Black Hawk County Jail fails because the plaintiff does not assert that either the City of Waterloo or the Black Hawk County Jail is liable for an injury that one of its employees inflicted because "a particular

---

[1] The court notes that the plaintiff is proceeding under 28 U.S.C. § 1915, which requires the court to dismiss a case at any time if it determines that a plaintiff's action fails to state a claim upon which relief can be granted.

municipal policy or custom itself violates federal law, or directs an employee to do so" or a particular "lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Id.* (citing *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008)); *cf. Chambers v. St. Louis Cty.*, 247 F. App'x 846, 848 (8th Cir. 2007) (concluding that speculative allegations about an apparent policy were merely conclusory).

Regarding the State of Iowa, sovereign immunity under the Eleventh Amendment bars a suit brought solely against the state or an agency of the state. *See Brown v. Dep't of Human Servs.*, 451 F. App'x 690, 691 (8th Cir. 2011) (applying Eleventh Amendment), *Morstad v. Dep't of Corr. and Rehab.*, 147 F.3d 741, 743-44 (8th Cir. 1998) (same); *Williams v. Missouri*, 973 F.2d 599, 599-600 (8th Cir. 1992) (per curiam) (same). And, to the extent that the plaintiff believes the State of Iowa is subject to suit under 42 U.S.C. § 1983, the plaintiff cannot proceed any further against the State of Iowa because a "person" does not include states or their political subdivisions. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64-71 (1989) (holding that a state and its agencies are not "persons" within the meaning of 42 U.S.C. § 1983); *McLean v. Gordon*, 548 F.3d 613, 618 (8th Cir. 2008) (making clear that a claim for damages under 42 U.S.C. § 1983 may not be asserted against a state or an arm of the state).

### 2.    *Excessive Force Claim*

"[T]he objective reasonableness standard applies to excessive force due process claims by pretrial detainees." *Davis v. White*, 794 F.3d 1008, 1011 (8th Cir. 2015) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-73 (2015)); *accord Jackson v. Buckman*, 756 F.3d 1060, 1067 (8th Cir. 2014). Under this analysis, "'[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The focus

is on whether a defendant's purpose in using force was to injure, punish or discipline the detainee. *See Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014). Further, "'a court must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate.'" *Davis*, 794 F.3d at 1012 n.1 (quoting *Kingsley*, 135 S. Ct. at 2474); *see also Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) ("The Government has legitimate interests that stem from its need to manage the facility in which the individual is detained.").

> "'[And,] [l]iability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed.' Section 1983 does not sanction tort by association." *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 805-06 (8th Cir. 2010) (quoting *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006)). "An officer may be held liable only for his or her own use of excessive force." *Smith v. Kan. City, Mo. Police Dep't*, 586 F.3d 576, 581 (8th Cir. 2009).

*Smith*, 754 F.3d at 547-48.

As a preliminary matter, the court notes that the plaintiff misstates the record and fails to support his factual assertions. Examples include the following:

> The plaintiff states that he was flanked by Deputy Aaron Haas and Deputy Julie Lein, that he started to comply with their request to go up the stairs because Deputy Aaron Haas was speaking to him like a friend and that he started to go up the stairs but then went back down because he forgot his property. *See* Narrative Statement (docket no. 12) at 1. But, Deputy Aaron Haas and Deputy Julie Lein never flanked the plaintiff, and, rather than go up the stairs, the plaintiff moved past the stairs. Alternatively, the plaintiff asserts that he started to avoid the stairs, remembered that he left his property, asked Deputy Julie Lein if he could go and get his property and pulled away from Deputy Julie Lein because he did not trust her. *See* Amended Narrative Statement (docket no. 17) at 1.

But, Deputy Julie Lein clearly put her hand on the plaintiff's arm because the plaintiff moved past the stairs rather than ascend them.

The plaintiff maintains that: (1) Deputy Julie Lein placed handcuffs on the plaintiff and then Deputy Anthony Nai started punching him, Deputy Aaron Haas rammed his knee into the right side of his upper body and Deputy Zachary Holbach dug his fingers into the soft tissue of the plaintiff's jaw and pulled and pushed the plaintiff's face into the floor, *see* Supplement to Unsigned Resistance (docket no. 16) at 2; Plaintiff's Affidavit (docket no. 16) at 5; (2) he took blows to the back of the head while Deputy Zachary Holbach dug his fingers into his jaw, *see* Plaintiff's Affidavit (docket no. 16) at 4; (3) the video clearly shows deputies savagely beating him after Deputy Julie Lein removed her handcuffs from her utility belt and placed them on the plaintiff, *see* Plaintiff's Affidavit (docket no. 16) at 4-5; (4) the weight of deputies prevented the plaintiff from releasing his right hand, *see* Plaintiff's Affidavit (docket no. 16) at 4; (5) deputies violated jail policy when they hit him in the head and ribs without giving him any warning and after they eliminated any threat by him, *see* Unsigned Resistance (docket no. 11) at 1; (6) Deputy Aaron Haas administered knee strikes to the plaintiff's head and ribs, *see* Unsigned Resistance (docket no. 11) at 1; (7) Deputy Aaron Haas had a hand on the plaintiff's back and a hand on the plaintiff's right shoulder and, while in a kneeling position, Deputy Aaron Haas rammed his knee into the plaintiff's ribs, *see* Narrative Statement (docket no. 12) at 1; and (8) the plaintiff took two quick blows to his head and they were hard enough to make his head bounce off of the concrete, *see* Narrative Statement (docket no. 12) at 1. But, Deputy Julie Lein leaned in for no more than two seconds, *see* App'x, CD #1 (docket no. 10) at 9:26:44-46, and the plaintiff's assertion that he had handcuffs on while being beaten is inconsistent with his assertion that he could not free his hand because the weight of deputies prevented him from doing so. Moreover, although the plaintiff accounts for the actions of Deputy Anthony Nai (fist strikes to the lower back), the actions of Deputy Aaron Haas (knee strikes to ribs) and the actions of

Deputy Zachary Holbach (applied finger pressure to soft tissue of the plaintiff's jaw and pulled and pushed the plaintiff's face into the floor), the plaintiff fails to account for the individual who administered two quick blows to the back of his head. Because the left side of the plaintiff's face was being pressed down on the floor by Deputy Zachary Holbach, any knee strike would have landed on the front of the plaintiff's head, not the back of his head. No deputy, including the deputy that is nearest to the back of the plaintiff's head, that is, Deputy Todd Schmitt, is in a position to strike the back of the plaintiff's head with enough force to cause it to bounce off of the concrete, and no deputy moves in a manner around the back of the plaintiff's head so as to cause it to bounce off of the concrete.

The court deems it appropriate to rely on competent evidence, including but not limited to the video evidence, and to disregard incompetent evidence, which includes the plaintiff's contradictory allegations. *Cf. Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000) (relying on "objective" video footage to analyze the reasonableness of a police officer's actions in an excessive force case).

The plaintiff's allegations regarding the use of excessive force by deputies fail as a matter of law. The record, which includes the video evidence of the encounter involving deputies and the plaintiff, establishes beyond genuine dispute that deputies' actions on August 3, 2015 do not rise to the level of a constitutional violation. Indeed, it establishes that: (1) the plaintiff had a history of refractory and assaultive behavior; (2) the plaintiff remained outside of his cell well after the other inmates returned to their cells; (3) Deputy B. Rollins told the plaintiff to return to his cell, but the plaintiff refused to lock down and waited in the Dayroom because he wanted to settle matters with Deputy B. Rollins; (4) the plaintiff verbally threatened Deputy B. Rollins; (5) Deputy Aaron Haas and Deputy Julie Lein entered the Dayroom and repeatedly signaled to the plaintiff to go up the stairs; (6); Deputy Aaron Haas pointed his OC spray at the plaintiff; (7) Deputy Julie Lein asked the plaintiff to return to his cell; (8) the plaintiff evaded Deputy Aaron Haas and Deputy Julie

Lein; (9) the plaintiff told Deputy Aaron Haas not to touch him; (10) Deputy Julie Lein and Deputy Aaron Haas asked the plaintiff to go up the stairs and to tell them why he was so upset, but the plaintiff refused to go up the stairs; (11) Deputy Julie Lein, Deputy Aaron Haas, Deputy Todd Schmitt, Deputy Anthony Nai and Deputy Wyatt Landers gave the plaintiff the opportunity to go up the stairs and stood in positions to get the plaintiff to go up the stairs; (12) the plaintiff moved past the stairs and physically resisted efforts by Deputy Julie Lein and Deputy Aaron Haas to direct the plaintiff up the stairs; (13) the plaintiff physically resisted efforts by Deputy Aaron Haas and Deputy Anthony Nai to get the plaintiff up the stairs; (14) Deputy Aaron Haas, Deputy Anthony Nai and the plaintiff moved down the stairs and towards the control room wall; (15) Deputy Aaron Haas and Deputy Anthony Nai placed the plaintiff against the wall; (16) Deputy Anthony Nai had control of the plaintiff's left arm, but the plaintiff did not place his right hand behind his back while against the wall; (17) the plaintiff refused to let deputies take him to the floor and resisted Deputy Anthony Nai's attempt to get him on the floor by using his weight; (18) Deputy Aaron Haas, Deputy Anthony Nai and Deputy Wyatt Landers took the plaintiff to the ground in a controlled manner; (19) when taking the plaintiff to the ground and when landing on the ground, Deputy Aaron Haas maintained control of the plaintiff's head, Deputy Anthony Nai maintained control of the plaintiff's left arm and Deputy Wyatt Landers maintained control of the plaintiff's legs; (20) once they were on the ground, no deputy ever positioned his body on top of the plaintiff's back or lower body; (21) deputies tried to handcuff the plaintiff, but the plaintiff braced his right arm against his stomach and chest; (22) Deputy Anthony Nai commanded the plaintiff to place his right arm behind his back, but the plaintiff refused to comply with Deputy Anthony Nai's command and cursed at him; (23) Deputy Anthony Nai, Deputy Anthony Haas and Deputy Zachary Holbach used minimal force for about seven seconds to get the plaintiff to put his right arm behind his back so that they could secure the plaintiff's right hand; (24) deputies used no force

after the plaintiff put his right arm behind his back; (25) deputies calmly and appropriately assisted the plaintiff to his feet after placing handcuffs on the plaintiff; (26) deputies escorted the plaintiff to his cell, and, while they did so, the plaintiff threatened and cursed deputies; and (27) deputies removed the plaintiff's handcuffs and left the plaintiff's cell.

Clearly, the plaintiff became visibly upset after becoming unable to use the telephone when he wanted to use it. Despite being outside his cell nearly four minutes after other inmates returned to their cells, being aware that he might be pepper sprayed, being treated by Deputy Julie Lein in a non-aggressive manner and being treated by Deputy Aaron Haas like a friend, the plaintiff refused for nearly a minute to follow directions to return to his cell and became increasingly uncooperative by, among other things, aggressively responding to deputies' efforts to get him to go up the stairs. Video footage shows that, prior to deputies' use of force, the plaintiff resisted deputies' efforts to escort him to his cell. Rather than immediately take the plaintiff to the floor once they descended the stairs, deputies moved across the Dayroom and placed the plaintiff against a wall. While against the wall, the plaintiff did not place his right hand behind his back and he resisted deputies' efforts to get him on the floor. Just as he did when he was against the wall, the plaintiff refused to put his right hand behind his back once he was on the floor. To get the plaintiff under control, Deputy Anthony Nai used fist strikes, Deputy Aaron Haas used knee strikes and Deputy Zachary Holbach applied pressure to the plaintiff's jaw. The use of force by deputies appears to have simultaneously occurred over a span of time that lasted no more than seven seconds, that is, 9:26:47-53, because, after that point in time, the plaintiff remained in almost the exact same position, deputies remained very close to the plaintiff, deputies moved very little while they were near him and deputies that were hunched over the plaintiff's lower back were clearly working to secure the plaintiff's hands. Moreover, the plaintiff admits that no deputy struck him after Deputy Aaron Haas struck him, and that, after being struck, he was able to put his arm

behind his back. Once the plaintiff was under control, deputies calmly helped the plaintiff to his feet and took the plaintiff to a cell.

As previously stated, each deputy's actions must be evaluated separately. Given the plaintiff's refusal to put his arm behind his back, Deputy Anthony Nai appropriately relied on his training and applied no more force than was necessary to quickly and safely secure the plaintiff and to protect himself, the plaintiff and the other deputies. Clearly, Deputy Anthony Nai was not on top of the plaintiff and struck the plaintiff's lower back with his fist to get the plaintiff to provide his right hand to him so that deputies could place the plaintiff in handcuffs. Similarly, Deputy Aaron Haas applied pressure to the plaintiff's head to keep the plaintiff on the ground and, after moving down the plaintiff's right side, struck the plaintiff's ribs with his knee to get the plaintiff to release his right hand so that deputies could place the plaintiff in handcuffs. And, it is evident that, after Deputy Aaron Haas released the plaintiff's head, Deputy Zachary Holbach controlled it and applied pressure to the plaintiff's jaw in an effort to have the plaintiff release his right hand so that deputies could place the plaintiff in handcuffs. At no time did any deputy strike the back of the plaintiff's head, which was pointed toward Deputy Todd Schmitt, who was on one of his knees and close to the plaintiff, the entire time that the plaintiff remained on the floor. Consequently, the plaintiff only suffered minor, if any, injuries. Indeed, a nurse saw the plaintiff approximately 2 hours and 45 minutes after deputies used force so that they could put handcuffs on the plaintiff, only noted a small bruise on his right hand and provided the plaintiff an ice pack, which the plaintiff briefly used. And, approximately 3 hours and 40 minutes after deputies used force so that they could put handcuffs on the plaintiff, the plaintiff fell in his cell, but, pursuant to her examination of the plaintiff's head, a nurse found no evidence of redness, swelling or any other indication of his head being hit.

The facts clearly demonstrate that the plaintiff behaved irrationally and failed to cooperate with deputies even though he knew that he needed to return to his cell. Rather than comply with deputies' repeated directives, the plaintiff evaded deputies, acted aggressively towards them and refused to do what he was told to do. The facts also demonstrate that deputies: (1) repeatedly tried to allow the plaintiff to return to his cell on his own accord and to defuse his unjustified aggression, (2) diligently maintained their composure and professionalism even though the plaintiff became more uncooperative, unreasonable, belligerent and erratic; (3) elected not to use their OC spray; and (4) used a limited amount of force only to secure the plaintiff's right arm. They had a legitimate governmental interest in maintaining order, and the force they used for a short period of time was a reasonable means of meeting the objective. At no time did any deputy use force as a means to punish the plaintiff. All of the relevant factors do not support the plaintiff's position. *See Andrews v. Neer*, 253 F.3d 1052, 1060-61 & 1061 n.7 (8th Cir. 2001) (setting forth relevant factors, including "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether [the force] was used for punishment or instead to achieve a legitimate purpose"). It is clear that, under all of the circumstances, the use of force by deputies was objectively reasonable. Thus, the plaintiff failed to show a constitutional violation as required to recover for the use of excessive force.

### 3.    *Deliberate Indifference to Medical Needs Claim*

The plaintiff's right to medical care arises under the Due Process Clause of the Fourteenth Amendment. *See Jackson*, 756 F.3d at 1065. To analyze denial of medical care claims, however, "the deliberate-indifference standard that governs claims brought . . . under the Eighth Amendment" is applied. *Id*.

> Whether an official was deliberately indifferent requires both
> an objective and a subjective analysis. *Scott v. Benson*, 742

F.3d 335, 339-40 (8th Cir. 2014). Under the objective prong, [the plaintiff] must establish that he suffered from an objectively serious medical need. *See id*. at 340. To be objectively serious, a medical need must have been "diagnosed by a physician as requiring treatment" or must be "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id*. (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). Under the subjective prong, [the plaintiff] must show that an official "actually knew of but deliberately disregarded his serious medical need." *Id*. This showing requires a mental state "akin to criminal recklessness." Id. (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). Consequently, [the plaintiff] must show "more than negligence, more even than gross negligence" to evince deliberate indifference. *Fourte*, 746 F.3d at 387 (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)). Merely demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference. *Id*. at 389; *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). An inmate must demonstrate that a prison doctor's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Dulany v. Carnahan*, 132 F.3d 1234, 1240-41 (8th Cir. 1997).

*Id*. at 1065-66.

As a preliminary matter, the court notes that the plaintiff again misstates the record and fails to support his factual assertions. For example, the plaintiff maintains that, although he complained, nobody examined him after deputies used force to restrain him. *See* Unsigned Resistance (docket no. 11) at 1; Narrative Statement (docket no. 12) at 2; Plaintiff's Affidavit (docket no. 16) at 4. He also maintains that his seizure could have been avoided if he had received an adequate examination after deputies used force. *See* Supplement to Unsigned Resistance (docket no. 16) at 2. But, it is clear that the plaintiff only complained about his right hand after deputies used force and a nurse treated a bruise that he had, and it is also clear that a nurse treated the plaintiff after he fell in his cell.

Once again, the court will disregard incompetent evidence, which includes the plaintiff's contradictory allegations. *Cf. Wilson*, 209 F.3d at 715 (relying on "objective" video footage to analyze the reasonableness of a police officer's actions in an excessive force case).

The plaintiff's allegations regarding the defendants' deliberate indifference to his medical needs fail as a matter of law. The record, which includes the video evidence of the plaintiff while he was in his cell, establishes beyond genuine dispute that the defendants' actions do not rise to the level of a constitutional violation. Indeed, it establishes that: (1) the plaintiff exhibited violent behavior, including but not limited to kicking his door and punching a mirror with his right hand, shortly after deputies left his cell; (2) the plaintiff remained in his cell and showed no signs of any injury; (3) the plaintiff complained that he hurt his right hand, and, after he calmed down and stopped behaving badly, a nurse assessed and treated the plaintiff's right hand; (4) the plaintiff utilized the intercom, complained that he felt weird and, shortly after doing so, fell on the ground; (5) less than two minutes after the plaintiff fell, deputies checked on the plaintiff, and, less than two and a half minutes after the plaintiff fell, a nurse examined the plaintiff and found no signs of a head injury; (6) the plaintiff complained that his head hurt and deputies provided the plaintiff two Tylenol, which he took; (7) a nurse and a deputy checked on the plaintiff; (8) medical personnel frequently spoke with the plaintiff, checked on him while he was in segregation and provided him medication; and (9) the plaintiff later complained that he was punched and kneed in the ribs and experienced a seizure after taking multiple blows to the back of his head.

Even assuming that the plaintiff injured his right hand while refusing to provide it to deputies rather than when punching the mirror, no evidence indicates that the defendants actually knew of and deliberately disregarded signs that his injuries were serious and required immediate medical attention. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994)

(holding that, to be deliberately indifferent, a defendant must have "failed to act despite . . . knowledge of a substantial risk of serious harm"); *Allard v. Baldwin*, 779 F.3d 768, 771-72 (8th Cir. 2015) (stating that inmate must show that defendants were more than grossly negligent and that their mental state was akin to criminal recklessness, that is, they disregarded known risk to his health); *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993) (emphasizing that deliberate indifference requires a highly culpable state of mind approaching actual intent).  According to the video footage and other evidence, the plaintiff never appeared to need medical attention.  Throughout the video footage, the plaintiff uses all of his limbs.  Indeed, he kicks the door, punches the mirror, paces, adjusts his hair, throws things, jumps up and down, sits down and stands up.  He also admittedly had no trouble communicating with deputies or medical staff.  In fact, the plaintiff told the defendants that his right hand hurt and that he felt weird, and a nurse treated his right hand and examined him after he fell.  Further, there is also no evidence in the record showing harm to the plaintiff by the delay between the time deputies used force and the time that a nurse examined the plaintiff's right hand or by the delay between the time he fell in his cell and the time that deputies and a nurse responded.  *See Jackson v. Riebold*, 815 F.3d 1114, 1119-20 (8th Cir. 2016) (to prevail on claim that delay in medical care constituted cruel and unusual punishment, inmate must show deprivation of serious medical need and deliberate indifference to his health and safety; objective seriousness of deprivation is measured by reference to effect of delay, which must be established by verifying medical evidence); *Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (stating that there is insufficient evidence of serious medical need when the medical need claimed is based on bare assertion of inmate).  Thus, the plaintiff fails to establish a due process violation.

### 4.    *Other Argument*

Having concluded that the defendants are entitled to judgment as a matter of law because the record fails to establish a genuine issue of material fact with regard to whether

the defendants violated the plaintiff's constitutional rights, it is not necessary to review the defendants' remaining contention that they are entitled to qualified immunity. Nonetheless, qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law", *Malley*, 475 U.S. at 341, and the record does not establish that it would have been clear to a reasonable officer that the conduct of any deputy was unlawful in the situation confronted, *see Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *see also Plumhoff v. Rickard*, ___ U.S. ___, ___, 134 S. Ct. 2012, 2022-23 (2014) (addressing the defense of qualified immunity and emphasizing that "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it"); *Smith*, 754 F.3d at 546 (stating that the focus is on whether the officer had fair notice that the conduct was unlawful). This is especially so because (1) the plaintiff refused to comply with deputies' reasonable requests, disregarded deputies' attempts to handle the matter in a professional manner and behaved in an irrational manner and (2) the plaintiff cites no clearly established law that would have put deputies on notice that they could not use the force that they used. *Cf. Smith*, 754 F.3d at 547-49 (determining that officers were entitled to qualified immunity because no case law informed the officers that the use of kicks, punches, knee strikes and tasers under the circumstances that they confronted was unconstitutional). Similarly, the defendants are entitled to qualified immunity with respect to the plaintiff's deliberate indifference to medical needs claims, especially considering that the plaintiff exhibited no symptoms and they did attend to his medical needs. *Cf. Barton v. Taber*, 820 F.3d 958, 966-67 (8th Cir. 2016) (determining that officers should have understood that failing to seek medical care for a post-vehicular accident arrestee who exhibited the symptoms that the plaintiff exhibited would violate the arrestee's constitutional rights).

## VII. CONCLUSION

In light of the foregoing, the plaintiff's motion to appoint counsel (docket nos. 13 & 28) is **DENIED**; the plaintiff's motion to amend complaint (docket no. 14) is **GRANTED**; the plaintiff's motion for discovery (docket no. 20) and motion for jury trial (docket no. 22) are **DENIED**; the defendants' motion to strike (docket no. 25) is **DENIED**; and the defendants' motion for summary judgment (docket no. 10) is **GRANTED**. The clerk's office is **DIRECTED** to enter judgment in favor of the defendants. The clerk's office is also **DIRECTED** to close this case.

**IT IS SO ORDERED**.

**DATED** this 31st day of January, 2017.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA